UNITED STATES DISTRICT COURT
NORTHEN DISTRICT OF OKLAHOMA

_____
                              )
ETTA LOVE BARRE, as the       )
Special Administrator of the  )
ESTATE OF JOSHUA BARRE, Deceased, )
                              )
            Plaintiff,        )
                              )
        v.                    )          CIVIL ACTION
                              )          No. 18-cv-00276-WGY
WILL RAMSEY, BRANDON WALKER,  )
MONICA HOLLOWAY, BOARD OF COUNTY )
COMMISSIONERS OF TULSA COUNTY, )
OKLAHOMA, VIC REGALADO, in His )
Official Capacity,            )
                              )
            Defendants.       )
_____)


YOUNG, D.J.[1]                                    May 3, 2022

**MEMORANDUM AND ORDER**

**I. INTRODUCTION**

    Plaintiff Etta Love Barre, as the Special Administrator of

the Estate of Joshua Barre ("the Estate") brings this action on

behalf of Joshua Barre ("Barre").  Etta Barre is Barre's mother.

Barre suffered from severe mental illness that, when not managed

by medication, resulted in Barre suffering uncontrollable

psychotic episodes.  Tulsa County Sheriff's Office Deputies Will

Ramsey ("Deputy Ramsey"), Brandon Walker ("Deputy Walker"), and

_____

[1] Of the District of Massachusetts, sitting by designation.

Monica Holloway ("Deputy Holloway, collectively, "the Deputies") were part of a mental health unit and familiar with Barre's history of mental illness.  The Deputies unsuccessfully attempted to apprehend Barre under two civil commitment orders over a period of several days.  Unfortunately, two days after the last failed attempt, Barre was shot and killed by three law enforcement officers (including Deputies Ramsey and Walker) after Barre -- brandishing two large knives -- ignored police commands, shrugged off a Taser dart, and attempted to enter a convenience store.

As set forth in more detail below, on the record presented to the Court, while it is tragic that Barre suffered from uncontrolled mental illness and was not apprehended earlier, objectively the Deputies acted reasonably.  Specifically, Barre's constitutional rights were not violated under either the Fourteenth or Fourth Amendment.  The Sheriff is also entitled to judgment as matter of law on the federal and state law claims against him.  For the reasons stated below, the defendants' motions for summary judgment are therefore **ALLOWED** and judgment shall enter in favor of the defendants.

## II. BACKGROUND

### A.  Procedural History

The Estate brought this action against the Board of County Commissioners of Tulsa County ("the Board"), the Deputies and

Sheriff Vic Regalado in his official capacity only ("the Sheriff").  Am. Compl., ECF No. 18.

The Board was dismissed from this action on October 15, 2019, after the Estate failed to oppose a motion to dismiss. October 15, 2019 Order, ECF No. 32.

The Deputies filed a motion for summary judgment, Defs.' Mot. Summ. J. & Br. Supp. ("Deputies' Mot."), ECF No. 51, the Estate opposed the motion, Pls.' Resp. Op. Defs.' Mot. Summ. J. ("Opp'n Deputies' Mot."), ECF No. 61, and the Deputies filed a reply, Defs.' Reply Pl.'s Resp. Defs.' Mot. Summ. J. ("Deputies' Reply"), ECF No. 66.

The Sheriff filed a motion for summary judgment, Def. Vic Regalado's Mot. Summ. J. & Br. Supp. ("Sheriff's Mot."), ECF No. 52, the Estate opposed the motion, Pls.' Resp. Op. Def. Vic Regalado's Mot. Summ. J. ("Opp'n Sheriff's Mot."), ECF No. 62, and the Sheriff filed a reply, Def. Vic Regalado's Reply Pl.'s Resp. Def.'s Mot. Summ. J., ECF No. 67.

The Court heard oral argument on the motions for summary judgment on February 28, 2022, and took the matter under advisement.  Minutes of Proceedings, ECF No. 76.

**B.  Facts of Record**

The following facts derive from the Deputies' motion and the parties' briefings related thereto.[2]  See Deputies' Mot.; Opp'n Deputies' Mot.; Deputies' Reply.

**1.    The Deputies Are Members of the Tulsa County Sheriff's Office Mental Health Unit**

"In May and June of 2017, . . . [the Deputies] all worked in the Tulsa County Sheriff's Mental Health Unit [("the Mental Health Unit")]."  Deputies' Mot. ¶ 2, at 5.  As the Deputies recount, "Barre had a history of severe mental illness, and had been picked up by the . . . Mental Health Unit several times before June of 2017."  Deputies' Mot. ¶ 7, at 6.  "Those encounters were initiated by Out of Custody Petitions for Mental Health Treatment which were filed by . . . Barre's mother, Etta Barre."  Id.  "Petitions were filed in January of 2014, November of 2016, and February of 2017."  Id.

The Estate agrees that Barre was "was profoundly and seriously mentally ill," being "diagnosed as [s]chizoaffective disorder, bipolar type."  Opp'n Deputies' Mot. ¶ 7, at 2.  Additionally, Barre was "prescribed numerous psychotropic medications but had a history of noncompliance."  Id.

---

[2] The Sheriff's statement of facts is in relevant part captured by the Deputies' statement of facts.

"On May 31, 2017, the Mental Health Unit received a signed civil mental health pickup order." Id. ¶ 8, at 4. "The Order required the Mental Health Unit to locate Josh and take him to the Tulsa Center for Behavioral Health ("TCBH") for an evaluation and involuntary commitment." Id.

According to the Deputies, they "attempted to make contact with [] Barre several times in the next week following the May 31[, 2017] civil pick up order." Deputies' Mot. ¶ 10, at 6. "On June 1[, 2017], June 5[, 2017], and June 7[, 2017,] contact was made with Joshua Barre [(although it is disputed whether contact was actually made with him on June 5)], but he was not picked up as he was violent and Deputies could not get him to come outside of his house." Id. ¶ 10, at 6-7 (citation omitted).

The Estate adds the following. "According to a 'Use of Force' memo by Deputy Holloway, the Mental Health Unit first contacted [Barre's mother] who informed them that '[Barre] was not staying in her home at the time due to his violent behavior so she had allowed him to stay in a house the family owned at 301 West 50th Court.'" Opp'n Deputies' Mot. ¶ 10, at 5 (citation omitted). "As Deputy Holloway summarizes the June 1[, 2017] contact, the Mental Health Unit arrived at the house to notice all the windows were open and the back and front main doors were opened but both screen doors were closed." Id. "As

[5]

Holloway report[ed], 'Deputy Walker attempted to speak with
[Barre] through the front door but he began yelling, I am armed
and dangerous while grabbing a hammer and pointing it
aggressively in the direction of the front door where deputies
were standing.'"   Id.   "'[Barre] then slammed the main door and
locked it' and next 'did the same to the back door before
walking through the house and shutting any open windows and
closed all the blinds.'"   Id. (citation omitted).

"Deputy Ramsey admits that he knew, as of June 1[, 2017,]
that [Barre] was off of his medications and violent."   Id. ¶ 10,
at 6.   "And, the Mental Health Unit 'had a civil pickup order
indicating to [them] that the court ha[d] found probable cause
that this person is a danger to [himself] or others. . . .'"
Id. (citation omitted).   "[T]he Mental Health Unit made no
[further] attempt to take [Barre] into protective custody on
June 1[, 2017], but rather, left him at the residence in his
psychotic and dangerous state."   Id.   "The Mental Health Unit
had no written protocol as to what action to take in an instance
like this where they had received a civil pickup order, arrived
at the location and found the individual who was subject to the
order to be in a state of acute psychosis."   Id.

On June 5, 2017, a second order was issued by the court,
indicating "that there was 'probable cause to believe' [Barre]
was in need of 'an emergency evaluation and that the least

restrictive means to accomplish this evaluation [wa]s an emergency detention.'"  Id. ¶ 8, at 4.  "The Court specifically ordered the Mental Health Unit to go to [Barre's] residence -- at 615 East Latimer Place -- to place [Barre] into 'protective custody' for transport to TCBH."  Id. (citation omitted). "[T]hese Orders furnished the Mental Health Unit with immediate authority to take [] Barre into protective custody."  Id. ¶ 8, at 4.

"On June 5, 2017, Deputy Holloway arrived at the West 50th Court address, to attempt to execute the order once again."  Id. ¶ 10, at 6.  "As Holloway was getting out of her car, she was flagged down by [] a neighbor . . . 'who stated that [Barre] had been up all night causing a huge scene and scaring her children.'"  Id. (citation omitted).  Specifically, she told Deputy Holloway that Barre "had placed plywood against the fence closest to the side of [the neighbor's] house and had been beating the fence with plywood between one and three hours scaring her daughter."  Id.  She further told Holloway "that [Barre] had been seen walking from the house with "old school metal scissors with black handles in one hand and a knife in the back of his waistline and a hammer as well."  Id.  "As told to Deputy Holloway, on or before June 5, 2017, [Barre] was seen 'wearing a hoodie on his head walking to the store in the area

of 4600 North Cincinnati [Road] ranting to everyone.'"  Id.
(citation omitted).

The neighbor "also stated that her teenage son had a run in
with [Barre] because he was standing in the middle of the street
yelling, would not move, and they were trying to drive by."  Id.
The neighbor indicated that she "had made contact with [Barre's
mother] about the situation, but [Barre's mother] indicated that
she was 'scared of' [Barre] at this point."  Id.  The neighbor
"indicated, on June 5, 2017, that she 'was afraid [Barre] would
be hurt by someone if these actions continued.'"  Id.

"Deputy Ramsey was subsequently notified, on June 5, 2017,
of the increasing danger posed by [Barre]."  Id. ¶ 10, at 7.
"In simple terms, the Mental Health Unit knew, on June 5, 2017,
that [Barre] had been walking around his neighborhood, with
weapons in his hands, threatening neighbors."  Id.  "Even with
this information, it was the Mental Health Unit's position that
they would not -- and could not -- go into [] Barre's home to
place him into protective custody."  Id.

According to the Deputies, "[o]n June 7, 2017, [Deputies]
Ramsey, Walker and Holloway went to [] Barre's residence again
in an effort to pick him up."  Deputies' Mot. ¶ 11, at 7.
"Barre was agitated and would not talk to the Deputies."  Id.
"Instead, he yelled and screamed at them."  Id.  "While Deputy
Holloway was near an open window [] Barre charged at her and she

[8]

attempted to use her Taser on him through the open window."  Id.
"The Taser was not effective, and [] Barre closed the window."
Id.

The Estate adds the following detail.  "During the June 7,
2017 contact with [Barre]," Deputies Ramsey, Walker, and
Holloway "escalated an already dangerous situation, made no
attempt to place Barre into protective custody and simply left
him at home in a dangerously psychotic and agitated state."
Opp'n Deputies' Mot. ¶¶ 11-12, at 7.  "When the Mental Health
Unit arrived at the West 50th Court residence on June 7, the
front door was wide open with a screen door closed."  Id.
"Deputy Walker asked [Barre] to come talk to him through the
screen door."  Id.  "At that point, according to the Mental
Health Unit, [Barre] yelled in an 'agitated voice': 'Who the
f**k is it?!?'"  Id. (citation omitted).  "[Barre] was standing
'inside the house near [an] open window,' while Deputy Holloway
was outside the window."  Id. (citation omitted).  "[Barre],
while still in his house, 'charged toward the open window in an
aggressive manner while screaming in a rage like behavior
saying, 'I'm going to kill you!'"  Id. (citation omitted).
"During her deposition, [although not in her memo or report,]
Deputy Holloway asserted that [Barre] had a hammer in his hand
when he charged toward her."  Id.  "In her Use of Force Memo,
Deputy Holloway represented: 'Knowing past history on [Barre]'s

[9]

behavior when he is not on his medications as well as the neighbors reporting him walking around with different types of weapons, threatening them, and causing issues with everyone I was unsure if [Barre] would throw or try to use any weapons through the windows.'"  Id. ¶¶ 11-12, at 7-8 (citation omitted). As the Estate characterizes it, "Deputy Holloway did not 'attempt' to use her Taser as Defendants assert.  Rather, Deputy Holloway responded by 'present[ing] and deploy[ing] [her] Taser through the window' at [Barre]."  Id. ¶¶ 11-12, at 8.  "It is unknown whether the Taser 'probes' made contact with [] Barre's person."  Id.  "After Deputy Holloway deployed the Taser through the window, [Barre] 'slammed the window and locked it. . . .'"  Id. (citation omitted).

The Estate adds that even "[t]aking Deputy Holloway's version of the events of June 7[, 2017] as true, [Barre] committed an 'arrestable offense' of attempted assault on an officer."  Id. (citation omitted).  "In addition, as of June 7[, 2017], it was obvious to the Mental Health Unit that [Barre]'s untreated state of acute psychosis was not improving."  Id. "Still, despite having a valid mental health protective custody order -- and despite knowledge that [] Barre was acutely psychotic, had been brandishing weapons and threatening neighbors and law enforcement officers -- the Mental Health Team made no attempt to apprehend [] Barre on June 7, 2017."  Id.

[10]

"Rather, yet again, they left him, in his dangerously psychotic and agitated state, alone in the house on West 50th Court." Id.

"The TCSO's use of force review board later found that Deputy Holloway's deployment of her Taser -- on [Barre] -- was 'unjustified.'" Id. (citation omitted). "TCSO was to provide Holloway with 'remedial training,' but that 'never happened.'" Id. (citation omitted). "Deputy Walker does not understand why Holloway deployed her Taser at [Barre] through an open window." Id.

The Deputies' account continues. "Following the June 7, 2017 encounter, believing that any further efforts would risk an encounter that could result in an escalation of violence, Deputies Ramsey, Walker[,] and Holloway left [] Barre's residence without picking him up." Deputies' Mot. ¶ 12, at 7. "Deputies Ramsey, Walker and Holloway did not want to force a confrontation on June 7, 2017, so they left [] Barre's residence," id. ¶ 15, at 7, although the Estate claims this is "marginally relevant and inherently a question of fact" without citation, Opp'n Deputies' Mot. ¶ 15, at 9.

According to the Estate, "[o]n June 9th, 2017, at approximately 10:00 a.m., Deputies Ramsey and Walker were riding in Ramsey's patrol vehicle, an unmarked black Chevrolet Tahoe, near the West 50th Court residence." Opp'n Deputies' Mot. ¶ 16, at 9. "Around this same time, Deputy Holloway, who was at TCBH,

[11]

received a message to call dispatch." Id. "About three minutes later, Deputy Holloway contacted dispatch." Id. "A female dispatcher informed Deputy Holloway that TCSO had received 'multiple 911 calls' that [] Barre was 'walking down the street with two large knives in his hands.'" Id. (citation omitted). "Deputy Holloway then immediately called Deputies Ramsey and Walker and relayed this information to them." Id. "Deputies Ramsey and Walker responded to this call, acting as law enforcement officers with specific knowledge about [Barre's] condition and history." Id.

The Deputies claim that "[a]t about 4800 N. Boston Place, Deputies Ramsey and Walker spotted [] Barre walking in the middle of the street." Deputies' Mot. ¶ 17, at 8. "He was wearing gray shorts, no shirt, and had a gray cloth tied on his head." Id. "He had two large butcher knives in his right hand and appeared angry, aggressive and hostile." Id.

The Estate adds the following. When Deputies "Ramsey and Walker turned into [Barre's] neighborhood, and came to 4800 North Boston Place, they observed [Barre] walking southbound in the middle of the street." Opp'n Deputies' Mot. ¶ 17, at 9. "[Barre] was shirtless, wearing shorts, had a cloth hat tied around his head and armed with two butcher knives in his right hand." Id. "At the time, the patrol vehicle was approximately 2-3 houses behind [Barre]." Id.

[12]

"Once [Barre] saw [Deputies] Ramsey and Walker in the patrol vehicle, he separated the large butcher knives, one in each hand, stopped and turned his body to face them." Id. ¶ 17, at 9-10. "[Barre] next clashed both blades together, 'turned the knives towards [Deputies Ramsey and Walker], gritted his teeth, scowled, with rigid muscularity and flexed his arms with the knives in both hands.'" Id. ¶ 17, at 10 (citation omitted).

"[Barre] was obviously in a state of 'deep psychosis.'" Id. (citation omitted). "Deputies Ramsey and Walker did not roll down the patrol vehicle window and attempt to speak with [Barre]." Id. "Deputies Ramsey and Walker did not use the vehicle's horn/loudspeaker to issue any command to [Barre], or otherwise communicate with him." Id. "[Barre] then 'continued his advance in a determined walk southbound towards East 49th Street North, continually banging the blades together. . . .'" Id. (citation omitted). "As [Barre] walked down the street, clanging the knives together, there were people around in the neighborhood." Id. "Deputy Walker recognized [Barre] as a potential threat." Id.

The Deputies continue as follows. "Deputy Ramsey contacted the dispatch and asked for additional units for assistance." Deputies' Mot. ¶ 18, at 8. "Meanwhile, he and [Deputy] Walker followed [] Barre from about one to two houses behind him and kept dispatch apprised of their location." Id. "Deputy Ramsey

[13]

called for backup via his police radio." Deputies' Mot. ¶ 19, at 8. "Deputy Ramsey did not want to force a confrontation with [] Barre and believed it was safest to keep him monitored while they waited on help to arrive." Deputies' Mot. ¶ 20, at 8.

The Estate adds that "Deputy Ramsey notified dispatch that there was an individual walking down the street with knives and requested backers to the location." Opp'n Deputies' Mot. ¶¶ 18-20, at 10. "Deputies Ramsey and Walker followed [Barre] -- in their patrol vehicle -- at a distance of 1-2 houses behind him." Id. "[Barre] appeared agitated and psychotic and was walking with 'pace' as if he was on a 'mission.'" Id. (citation omitted). "[Barre] was walking toward a busy commercial area at the intersection of East 46th Street North and MLK." Id.

"Deputy Ramsey knew that if [Barre] made it out of the neighborhood to that busy commercial area, it would be a 'more dangerous' situation." Id. (citation omitted). "Yet, as [Barre] walked through the neighborhood, Deputy Ramsey and Deputy Walker merely followed behind him, making no attempt to pull the vehicle in front of him to impede or block his progress." Id.

"Rather, for upwards of fifteen (15) minutes, they continued to simply follow [Barre] though the neighborhood -- 1-2 houses behind -- as he marched in a determined fashion, armed with two butcher knives, toward the busy commercial area to the

[14]

south." Id. ¶¶ 18-20, at 10-11. "[Deputies] Ramsey and Walker continued to follow [Barre] through the neighborhood in this manner for a distance of roughly one-half mile." Id. ¶¶ 18-20, at 11. "At no time -- as [Barre] walked through the neighborhood -- did Ramsey or Walker attempt to use less lethal force (i.e., Tasers, batons[,] or pepper spray) to subdue him." Id. "While [Barre] walked through the neighborhood, [Deputies] Ramsey and Walker never issued any verbal warning or command; they never even verbally commanded Barre to drop the knives until [Barre] was seconds away from the Super Stop." Id.

"As [Deputies] Ramsey and Walker continued to follow in the patrol vehicle, [Barre] crossed Martin Luther King Blvd walking on the eastside of the roadway." Id. ¶ 21, at 11. "[Barre] was 'continuing to intermittently bang his knives and taunt [Ramsey and Walker] a[s] he continued his fiercely determined walk.'" Id. (citation omitted).

"'At about 4700 North Martin Luther King Blvd, [Barre] dropped on his knees to the ground on the side of the road and placed the large knives right in front of each knee.'" Id. (citation omitted). "'[Barre] then bowed down on the ground, raised empty hands to the sky and turned his head towards the sky.'" Id. (citation omitted).

"4700 North Martin Luther King Blvd, where [Barre] dropped to his knees, is just to the north of the busy intersection []

[15]

at E 46th Street North, and still a safe distance from the intersection and Super Stop store." Id. "During this time -- when [Barre] was on his knees and unarmed -- Ramsey and Walker made no attempt to tase him, pepper spray him, block his pathway, apprehend him or even make any verbal commands." Id. "When asked why he didn't just pull up next to [Barre] and pepper spray him through the vehicle window -- when he was on his knees and unarmed -- Deputy Walker answered: 'I don't know.'"[3] Id. ¶ 21, at 11-12. "After, once again, [Deputies] Ramsey and Walker did nothing to impede or subdue him, [Barre] picked the knives back up, got off of his knees and 'continued

---

[3] As quoted above, Deputy Walker's response is incomplete and out of context.  The full colloquy follows:

> Q: All right. At that point in time, Mr. Barre is on his knees, his hands are in the air, and the knives have been placed in front of him, okay?  Why did you and Ramsey not just pull up and apprehend him at that point in time using less lethal?
> A: Again, he's still got two knives in front of him.  I don't think I have the time to get out and magically apprehend him when I've got containment on the way.
> Q: Well, I'm not talking about magically apprehending him. I'm talking about just pulling up next to him and spraying him with pepper spray?
> **A: I don't know.**
> **Q: Okay.**
> **A: I didn't believe that would be a safe option.**

Opp'n Deputies' Mot., Ex. 1, Walker Dep. 168:17-169:9, ECF No. 61-1 (emphasis added).

his determined advance by walking southbound on Martin Luther King Blvd towards the busy intersection of 4600 North Martin Luther King Blvd.'"   Id. ¶ 21, at 12 (citation omitted).

The Deputies continue.  "Before help could arrive, [] Barre reached the parking lot of the Super Stop convenience store at 4600 N. Martin Luther King [Boulevard] and started heading for the entrance."  Deputies' Mot. ¶ 21, at 8-9.  "[Deputies] Ramsey and Walker tried to use their police car to impede Joshua Barre from reaching the front door, but he walked around them."  Id.

According to the Estate, "Deputy Ramsey used his patrol vehicle to enter into the middle of the intersection, stopping there and using the siren intermittently to stop traffic."  Opp'n Deputies' Mot. ¶ 21, at 12.  "By stopping traffic on East 46th Street North in this manner, [Deputies] Ramsey and Walker gave [Barre] a clear pathway across the street and to the Super Stop convenience store."  Id.  "It was at this point [Barre] began to turn from walking along MLK [Boulevard] toward the Super Stop on the northeast corner of 4600 North MLK [Boulevard]."  Id.  "[Deputy] Walker then told Ramsey, 'we cannot let him get inside that store.'"  Id.  "Deputy Walker was concerned that if he got out of the vehicle, [Barre] would attack him with the knives, but was never concerned that [Barre] would attack the neighbors in their yards or other bystanders."  Id.  "It was only at the point that [Barre] was heading directly

[17]

toward the Super Stop that Deputies Ramsey and Walker finally attempted to use the patrol vehicle to impede his pathway." Id. "At this same time, Tulsa Police arrived, providing limited 'dash cam' video of the moments before [Barre's] tragic death." Id.

The Deputies continue. "[Deputies] Walker and Ramsey got out of their vehicle and started yelling commands at [] Barre to drop the knives and not go into the store." Deputies' Mot. ¶ 22, at 9. "[Deputy] Ramsey drew his gun and [Deputy] Walker drew his Taser." Id. As Barre approached "the front door [Deputy] Walker attempted to Taser [] Barre. However, it was not effective." Id.

The Estate adds the following facts. "As [Barre] approached the Super Stop store, he walked through an empty parking lot." Opp'n Deputies' Mot. ¶ 22, at 12. "Yet, Deputies Ramsey and Walker made no attempt to use less lethal force or otherwise attempt to subdue [Barre] as [he] walked through the empty parking lot." Id. "This was the first time on June 9, when [Barre] was seconds away from the Super Stop doorway, that Deputies Ramsey and Walker made any attempt to talk to [Barre], commanding [Barre] to drop the knives." Id. ¶ 22, at 12-13. "However, it was clearly too late." Id. ¶ 22, at 13. "With [Barre] right at the cusp of the Super Stop doorway, Deputy

[18]

Walker, for the first time, attempted to use his Taser.  Id.
"It was too late for this, as well."  Id.

    "Just as [] Barre opened the door to the convenience store,
[Deputy] Ramsey [and Deputy Walker] used deadly force by
shooting [] Barre with their guns."  Deputies' Mot. ¶ 23, at 9.
"[Deputies] Ramsey and Walker were in fear for the lives of
those inside the store as [Barre] was in a highly psychotic
state and they believed he posed an immediate threat of serious
bodily harm or death to anyone who was in the store."  Id.

    The Estate adds the following facts.  Opp'n Deputies' Mot.
¶ 23, at 13.  "As [Barre] began to open the door to the Super
Stop, Deputy Ramsey, Deputy Walker and [non-defendant] Tulsa
Police Officer Donnie Johnson ("Officer Johnson") all fired
their service weapons at [Barre], shooting him dead."  Id.

    Based upon the above description, the Court has
superimposed lines on Exhibit 13 to the opposition to summary
judgment depicting the Deputies' and Barre's apparent path of
travel southbound in blue and Officer Johnson's path of travel
northbound in orange.  See Opp'n Deputies' Mot., Ex. 13,
Satellite Map, ECF No. 61-13.  The termination of both arrows is
the approximate location of Deputy Ramsey, Deputy Walker, Barre,
and Officer Johnson at the beginning to the dashcam video.



Id.

Officer Johnson's dashcam video depicts most of the final

46 seconds of the incident.  Opp'n Deputies' Mot. Ex. 10,

Dashcam Video ("Video"), ECF No. 61-10.  The video opens with a

view northbound, as backup arrived from the North and South.

Id. 10:00:11.  Officer Johnson and an unidentified police vehicle in front of him proceeded at a high rate of speed with lights and sirens activated and pulling into the Super Stop parking lot.  Id. 10:00:11-10:0027.  The Deputies' SUV pulled into the empty parking lot to block Barre's path to the Super Stop, though Barre is not visible in the video at this distance. Id. 10:00:11-22.



Barre walked around Deputies Walker and Ramsey's vehicle, and the video captures Barre with a large knife in each hand walking intently toward the Super Stop.  Id. 10:00:31-36. Officer Johnson can be heard saying (apparently into his radio)

"he's walking towards the convenience store guys," and he immediately opened the door to his vehicle.  <u>Id.</u> 10:00:31  A voice (apparently Johnson) can be heard shouting "Hey, stop, do not go in there man!," while Barre continued to walk intently toward the Super Stop, ignoring the command.  <u>Id.</u> 10:00:34-36.





Deputies Walker and Ramsey approached from the direction of their vehicles with weapons drawn (one is apparently a Taser), and repeated their shouting of commands, although those commands cannot be heard because Officer Johnson's patrol vehicle's radio is blaring what appears to be another officer stating "[garbled], they need to go up and lock that door someone [garbled] glass [garbled].  Id. 10:00:36-40.

[23]



On the video, a  police vehicle car is visible to the East and Officer Johnson appears with his weapon drawn.   Id. 10:00:36-42.  The video then shows Officer Johnson in frame shouting, "Tase him, tase him!" almost immediately followed by the clicking sounds of the Taser electrical impulses for approximately five seconds.  Id. 10:00:40-46.



The parties do not dispute that Deputy Ramsey successfully deployed a Taser dart and that Barre apparently shrugged it off, ignored the Deputies and Officer Johnson's continued commands (unintelligible on the video), and attempted to enter the Super Stop.  Deputies' Mot. ¶¶ 22-23, at 9; Opp'n Deputies' Mot. ¶¶ 22-23, at 12-13.

Although not visible on video, two seconds after the Tasing sound ends, see Video 10:00:49, Deputies Walker and Ramsey and Officer Johnson shot Barre, Deputies' Mot. ¶ 23, at 9; Opp'n Deputies' Mot. ¶ 23, at 13.  While the video does not show the shooting, shots are heard directly and over the radio with a report of "shots fired."  Video 10:00:48-53.

The entire immediate shooting incident from Deputies Walker and Ramsey's attempt to block Barre with their SUV until shots are fired is approximately 30 seconds.  The time elapsed from where Barre appears on Officer Johnson's vehicle dashcam until the shots are fired is approximately 20 seconds.  The time from the first audible verbal warning (at least on the video by Officer Johnson) until the shots are fired is approximately 15 seconds.

## III. ANALYSIS

### A.  The Summary Judgment Standard

Summary judgment ought be allowed only "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit.  A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented."  Estate of Taylor v. Salt Lake City, 16 F.4th 744, 756 (10th Cir. 2021) (quoting E.E.O.C. v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1190 (10th Cir. 2000)).

At summary judgment, the Court views "the evidence and the reasonable inferences to be drawn from the evidence in the light

most favorable to the nonmoving party."  Id. (quoting Schaffer
v. Salt Lake City Corp., 814 F.3d 1151, 1155 (10th Cir. 2016)).
"In qualified immunity cases, this usually means adopting . . .
the plaintiff's version of the facts."  Id. (quoting Scott v.
Harris, 550 U.S. 372, 378 (2007).  "However, the general
proposition that [the Court] accept plaintiff's version of the
facts in the qualified-immunity summary-judgment setting 'is not
true to the extent that there is **clear contrary** video evidence
of the incident at issue.'"  Id. (emphasis in original) (quoting
Thomas v. Durastanti, 607 F.3d 655, 659 (10th Cir. 2010).
Indeed, "[w]hen opposing parties tell two different stories, one
of which is blatantly contradicted by the record, so that no
reasonable jury could believe it, a court should **not** adopt that
version of the facts for purposes of ruling on a motion for
summary judgment."  Id. (quoting Scott, 550 U.S. at 380).
Specifically, qualified immunity is an affirmative defense that
changes the calculus at summary judgment:

> When a defendant moves for summary judgment on
> the basis of qualified immunity, **the plaintiff
> bears an initial burden to show "(1) that [the]
> defendant violated a constitutional right and (2)
> that the right was clearly established."**
> Thomson, 584 F.3d at 1325 (Holmes, J.,
> concurring).  **And, in determining whether the
> plaintiff has met this burden, "ordinarily courts
> must 'adopt' [the] plaintiff's 'version of the
> facts.'"**  Id. (quoting Scott v. Harris, 550 U.S.
> 372, 380 (2007)).  **But, at the summary-judgment
> stage, "a plaintiff's version of the facts must
> find support in the record."**  Thomson, 584 F.3d

[27]

at 1325 (Holmes, J., concurring). **However, the court is not required to adopt the plaintiff's version of the facts if that version lacks record support or is "'so utterly discredited by the record that no reasonable jury could have believed' it."** Thomson, 584 F.3d at 1325 (Holmes, J., concurring) (quoting Scott, 550 U.S. at 380). The court's first task then **"is to determine whether [the] plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the legal question before the court"** regarding qualified immunity. Id. at 1326 (emphasis in original). Once the "universe of facts" is identified, the court must answer the legal question of whether the officer is entitled to qualified immunity. Id. As to that question, the court has discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first," Pearson v. Callahan, 555 U.S. 223, 236 (2009), "and may resolve the question by finding either requirement is not met," Mascorro v. Billings, 656 F.3d 1198, 1204 (10th Cir. 2011).

Wilson v. McKinney, 20-CV-0184-CVE-JFJ, 2021 WL 4942804, at *4

(N.D. Okla. Oct. 22, 2021) (Eagan, J.) (emphasis added).

   **B.  The Deputies' Motion for Summary Judgment (ECF No. 51)**

   The Deputies move for summary judgment on claims brought

under 28 U.S.C. § 1983 as to counts I and II. "Unlike the

Constitution, Section 1983 'is not itself a source of

substantive rights.'" Sturdivant v. Fine, 20-3147, 2022 WL

67734, at *3 (10th Cir. Jan. 7, 2022) (quoting Sawyers v.

Norton, 962 F.3d 1270, 1282 (10th Cir. 2020)). "Section 1983

serves instead only as a vehicle to 'provide[ ] relief against

those who, acting under color of law, violate federal rights

[28]

created elsewhere.'" Id. (quoting Brown v. Buhman, 822 F.3d 1151, 1161 n.9 (10th Cir. 2016). Section 1983 "provides that a person acting under color of state law who 'subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.'" Sawyers, 962 F.3d at 1281-82 (quoting 42 U.S.C. § 1983).

As the Tenth Circuit has recently held: "[a] defendant's assertion of qualified immunity from suit under 42 U.S.C. § 1983 results in a presumption of immunity." Estate of Taylor, 16 F.4th at 757. That presumption of qualified immunity can be overcome by a plaintiff "only by showing that (1) the officers' alleged conduct violated a constitutional right, and (2) it was clearly established at the time of the violation, such that every reasonable official would have understood, that such conduct constituted a violation of that right." Id. (citations, quotations and punctuation omitted). The Court "may exercise [its] discretion as to which prong to address first." Id. at 757-758 (citing Tolan v. Cotton, 572 U.S. 650, 656 (2014) ("Courts have discretion to decide the order in which to engage these two prongs.")). Here, the Deputies move for summary judgment on the ground that no constitutional violation occurred

under either the Fourteenth or Fourth Amendment, which also
entitles them to qualified immunity.  The Court agrees.

### 1. Count I -- Section 1983 Claim -- Fails as Matter of Law

#### a. Fourteenth Amendment Substantive Due Process Claims Fail as Matter of Law

"As a general matter, . . . a State's failure to protect an
individual against private violence simply does not constitute a
violation of the Due Process Clause [under the Fourteenth
Amendment]." DeShaney v. Winnebago County Dept. of Soc.
Services, 489 U.S. 189, 197 (1989).  There are two limited
exceptions carved out by DeShaney v. Winnebago pertaining to a
substantive due process claim under the Fourteenth Amendment:
(1) circumstances where there exists a "special relationship";
or (2) a "state-created danger" that exposes the plaintiff to a
harm to private violence. Gray v. U. of Colorado Hosp. Auth.,
672 F.3d 909, 923 (10th Cir. 2012).  While arguably the
exceptions might be pleaded in the alterative, the exceptions
are mutually exclusive in application. Id.  Neither is
applicable here.

#### i. No State-Created Danger Because No Private Action Caused Barre's Death

According to the Estate's version of the facts, Barre was
shot and killed by two of the Deputies (Walker and Ramsey), and
a third (non-defendant) Municipal Police Officer (Officer
Johnson) when Barre attempted to enter a convenience store with

[30]

two large knives during a psychotic episode.  See Opp'n
Deputies' Mot. ¶¶ 21-23, at 11-13 ("As [Barre] began to open the
door to the Super Stop, Deputy Ramsey, Deputy Walker and Tulsa
Police Officer Donnie Johnson all fired their service weapons at
[Barre], shooting him dead.").  The Deputies argue that the
state-created action doctrine does not apply because he was
killed by state action and not private action.  Deputies' Mot.
13-15; Deputies' Reply 7.  The Estate argues that the Deputies
"have cited no authority standing for the proposition that
violent conduct by a third-party law enforcement agency cannot
provide the basis for a State created danger/failure to protect
claim."  Opp'n Deputies' Mot. 17.

The Tenth Circuit has viewed the state-created danger
doctrine narrowly, observing the "state-created danger theory's
osmotic, ill-considered tendency to invade the province of both
common law negligence and state tort law."  Gray, 672 F.3d at
919.  "The state-created danger theory indulges the legal
fiction that an act of **private violence** may deprive the victim
of this constitutional guarantee [under the Fourteenth
Amendment]."  Id. at 927 (emphasis added).  "A precondition to
[the Tenth Circuit's] application of the state-created danger
theory is 'private violence.'"  Id. at 930.  As the Tenth
Circuit teaches, Barre's analysis that differentiates various
state-actors as "third parties" has been rejected:

[31]

> "Courts simply need not indulge this legal fiction
> where a **state actor**, rather than a **private individual**,
> is directly responsible for causing the harm.  This is
> because the state actor directly responsible for the
> deprivation of life, liberty, or property may be held
> personally liable under § 1983.  **Whether other state
> actors further down the chain of causation also may be
> liable poses separate questions of personal and/or
> supervisory liability**.

Gray, 672 F.3d at 928 (emphasis added); see also Moore v.

Guthrie, 438 F.3d 1036, 1042 (10th Cir. 2006) ("Plaintiff was

injured by a Simunition bullet fired by a fellow police officer

and not a private third party, the danger creation doctrine is

inapplicable.").  Barre was indisputably killed by bullets fired

by three "state" actors -- two Deputies and a municipal police

officer -- not a private actor.  Accordingly, the state-created

danger exception does not apply and the Fourteenth Amendment

claim fails as to this exception.

> ### ii.  No Special Relationship Because Barre Was Not in Custody and No Private Violence.

The Supreme Court held in DeShaney that "when the State

takes a person into its custody and holds him there against his

will, the Constitution imposes upon it a corresponding duty to

assume some responsibility for his safety and general well-

being."  489 U.S. at 199-200.  "The rationale for this principle

is simple enough: when the State by the affirmative exercise of

its power so restrains an individual's liberty that it renders

him unable to care for himself, and at the same time fails to provide for his basic human needs -- e.g., food, clothing, shelter, medical care, and reasonable safety -- it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." Id. at 200.  Thus, "[i]n the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf -- through incarceration, institutionalization, or other similar restraint of personal liberty -- which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means." Id.

The Tenth Circuit has held that "[a]bsent involuntary **restraint** . . . no duty to protect arises under the special-relationship theory." Christiansen v. City of Tulsa, 332 F.3d 1270, 1280-81 (10th Cir. 2003) (emphasis added) (rejecting police Departments' "quarantine" to plaintiff who barricaded himself in home as restraint necessary to establish special relationship).  Moreover, this exception also fails on a more fundamental level.  "Even assuming for the moment that [Barre] was in state custody at the time of his death, the complaint's failure to allege private violence . . . would render the

special relationship exception inapposite." <u>Gray</u>, 672 F.3d at
924 n.13.

### iii. Fourteenth Amendment Substantive Due Process Claim Fails Because the Deputies' Actions Fail to Shock the Conscience.

Even if the Fourteenth Amendment claim was otherwise valid,
"the ultimate standard for evaluating a substantive due process
claim is whether the challenged government action 'shocks the
conscience' of **federal judges**." <u>Ruiz</u> v. <u>McDonnell</u>, 299 F.3d
1173, 1183 (10th Cir. 2002) (emphasis added). "[T]o assist [it]
in that determination, [the Tenth Circuit] look[s] to the
following three factors: (1) the need for restraint in defining
the scope of substantive due process claims; (2) the concern
that § 1983 not replace state tort law; and (3) the need for
deference to local policymaking bodies in making decisions
impacting public safety." <u>Id.</u> at 1184.  When viewed in this
context, the Tenth Circuit has expressed that "[t]hese factors
counsel that application of danger creation as a basis for
§ 1983 claims is reserved for exceptional circumstances." <u>Id.</u>
"[O]rdinary negligence does not shock the conscience," and "even
permitting unreasonable risks to continue is not necessarily
conscience shocking." <u>Id.</u>  Indeed, "a **plaintiff** 'must
demonstrate a degree of outrageousness and a magnitude of
potential or actual harm that is truly conscience shocking.'"

Id. (emphasis added) (quoting Uhlrig v. Harder, 64 F.3d 567, 574

(10th Cir. 1995)).   Tenth Circuit Chief Judge Tymovich explained

it this way:

> Conduct "shocks the conscience" when it demonstrates
> such "a degree of outrageousness and a magnitude of
> potential or actual harm" that it "shocks the
> conscience of federal judges." Uhlrig v. Harder, 64
> F.3d 567, 573-74 (10th Cir. 1995) (quoting Collins v.
> City of Harker Heights, 503 U.S. 115, 126, 112 S.Ct.
> 1061, 117 L.Ed.2d 261 (1992)) (internal quotation
> marks omitted); see also Halley v. Huckaby, 902 F.3d
> 1136, 1155 (10th Cir. 2018) ("Conduct that shocks the
> judicial conscience is deliberate government action
> that is arbitrary and unrestrained by the established
> principles of private right and distributive
> justice.") (quoting Hernandez v. Ridley, 734 F.3d
> 1254, 1261 (10th Cir. 2013)) (internal quotation marks
> omitted).

> **This standard is exacting, in large part because the
> complete universe of state-law torts might otherwise
> then be distorted into constitutional violations of
> due process.** Dawson v. Bd. of Cty. Commr's of
> Jefferson Cty., 732 F. App'x 624, 634 (10th Cir. 2018)
> (Tymkovich, C.J., concurring), cert. denied --- U.S. -
> ---, 139 S. Ct. 862, 202 L.Ed.2d 569 (2019).  We have
> therefore observed that only the most genuinely
> egregious abuse or misuse of governmental power will
> be sufficient to clear the burden required to shock
> the judicial conscience. E.g., Lindsey v. Hyler, 918
> F.3d 1109, 1116 (10th Cir. 2019).

Colbruno v. Kessler, 928 F.3d 1155, 1167 (10th Cir. 2019)

(Tymkovich, C.J., dissenting) (emphasis added).  The record in

this case, while tragic, does not "shock the conscience" under

this high standard, and the Fourteenth Amendment substantive due

process claims alternatively fail on this ground.

**b.** **Fourth Amendment Claim Fails as Matter of Law.**

"'The intrusiveness of a seizure by means of deadly force is unmatched' and implicates the highest level of Fourth Amendment protection." Elifritz v. Fender, 460 F. Supp. 3d 1088, 1104 (D. Or. 2020) (quoting Tennessee v. Garner, 471 U.S. 1, 9 (1985)). "Over thirty years ago, the Supreme Court recognized the cold reality that 'police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation.'" Estate of Taylor, 16 F.4th at 747 (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)). As the Tenth Circuit further explained, "the Fourth Amendment is clear: officers need not wait until they see the gun's barrel or the knife's blade before using deadly force to protect themselves or those around them." Id. Rather, "[t]hey must simply act reasonably." Id. (citing Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018)). Indeed, "[t]he Fourth Amendment standard is reasonableness, and it is reasonable for police to move quickly if delay would gravely endanger their lives or the lives of others." City and County of San Francisco, Calif. v. Sheehan, 575 U.S. 600, 612 (2015) (quotations omitted).

The Tenth Circuit "treat[s] excessive force claims as seizures subject to the reasonableness requirement of the Fourth Amendment.  To establish a constitutional violation, the plaintiff must demonstrate the force used was **objectively** unreasonable." Estate of Taylor, 16 F.4th at 759 (emphasis added).  The reasonableness of a particular use of force must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. (quoting Bond v. City of Tahlequah, 981 F.3d 808, 815 (10th Cir. 2020)).  At the same time, Tenth Circuit precedent "recognizes that the reasonableness of the use of force depends not only on whether the officers were in danger at the precise moment that they used force, but also on whether the officers' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." Id. at 761 (quoting Estate of Valverde ex rel. Padilla v. Dodge, 967 F.3d 1049, 1060 (10th Cir. 2020)).

The Supreme Court emphasized in Graham that a "test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," but rather "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively

[37]

resisting arrest or attempting to evade arrest by flight."
Graham, 490 U.S. at 396; accord Estate of Taylor, 16 F.4th at
762.  The Tenth Circuit explains the Supreme Court factor
analysis this way:

> In Graham v. Connor the Supreme Court provided
> three factors to help structure this inquiry: (1) the
> severity of the crime at issue; (2) whether the
> suspect poses an immediate threat to the safety of the
> officers or others; and (3) whether the suspect is
> actively resisting arrest or attempting to evade
> arrest by flight.  See id.  "Our precedents instruct
> that the Graham factors are applied to conduct which
> is 'immediately connected' to the use of deadly
> force."  Bond, 981 F.3d at 816 (quoting Romero v. Bd.
> of Cnty. Comm'rs, 60 F.3d 702, 705 n.5 (10th Cir.
> 1995)).  But, officer conduct prior to the seizure is
> also relevant to this inquiry.  Id. (citing Sevier v.
> City of Lawrence, 60 F.3d 695, 699 (10th Cir. 1995)).
> "[E]ven when an officer uses deadly force in response
> to a clear threat of such force being employed against
> him, the Graham inquiry does not end there."  Id.
> (citing Allen v. Muskogee, 119 F.3d 837, 839, 841
> (10th Cir. 1997)).  Specifically, we properly inquire
> "whether the officer['s] own reckless or deliberate
> conduct during the seizure unreasonably created the
> need to use such force."  Valverde, 967 F.3d at 1067
> (quoting Pauly, 874 F.3d at 1219). . . . "[A]lthough
> the first and third [Graham] factors can be
> particularly significant in a specific case, the
> second factor -- whether there is an immediate threat
> to safety -- 'is undoubtedly the most important . . .
> factor in determining the objective reasonableness of
> an officer's use of force.'"  See Valverde, 967 F.3d
> at 1060-61 (omission in original) (emphasis added)
> (footnote omitted) (quoting Pauly, 874 F.3d at 1216);
> see Vette v. K-9 Unit Deputy Sanders, 989 F.3d 1154,
> 1170 (10th Cir. 2021); Bond, 981 F.3d at 820; see also
> Est. of Lopez ex rel. Lopez v. Gelhaus, 871 F.3d 998,
> 1005-06 (9th Cir. 2017) (observing that, while the
> first and third Graham factors weigh in plaintiff's
> favor, the "'most important' factor," and the
> determinative one in a deadly force case, was "whether
> the suspect posed an 'immediate threat to the safety

of the officers or others'" (quoting <u>George</u> v. <u>Morris</u>, 736 F.3d 829, 838 (9th Cir. 2013))).

"That is particularly true when the issue is whether an officer reasonably believed that he faced a threat of serious physical harm." <u>Valverde</u>, 967 F.3d at 1061.  And, not only is the second factor of singular importance, it also is the most "fact intensive factor." <u>Pauly</u>, 874 F.3d at 1216; <u>see</u> <u>Reavis</u>, 967 F.3d at 985 (finding that the second <u>Graham</u> factor is "undoubtedly the 'most important' and fact intensive factor," and "[t]his is particularly true in a deadly force case, because 'deadly force is justified only if a reasonable officer in the officer's position would have had probable cause to believe that there was a threat of serious physical harm to himself or others.'" (first quoting <u>Pauly</u>, 874 F.3d at 1216, then quoting <u>Cordova</u>, 569 F.3d at 1192)).

At bottom, then, "it [is] insignificant whether [an individual was] arrested for a minor crime or was not even a criminal suspect if it reasonably appeared that he was about to shoot at an officer from close range." <u>Valverde</u>, 967 F.3d at 1061; <u>see</u> <u>Reavis</u>, 967 F.3d at 985; <u>Cordova</u>, 569 F.3d at 1190.

<u>Estate of Taylor</u> 16 F.4th at 762–63.  Accordingly, the test is a balancing of factors weighing heavily on the second factor.

In performing this analysis, while the Court "must consider the totality of the circumstances, <u>Estate of Larsen</u> [v. <u>Murr</u>, 511 F.3d 1255, 1260 (10th Cir. 2008)] [also] lists four [non-exclusive] factors designed to assist [the Court] in evaluating the degree of threat perceived by an officer: (1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and

(4) the manifest intentions of the suspect." Id. at 765
(citation and quotations omitted).  The purpose of the factor
analysis is ultimately to "aid[] in making the ultimate
determination, which is whether, from the perspective of a
reasonable officer on the scene, the totality of the
circumstances justified the use of force." Id. (citation and
quotations omitted).  In the end, "[t]he officer's belief need
not be correct -- in retrospect the force may seem unnecessary -
- as long as it is reasonable." Id.  Indeed, "The Fourth
Amendment standard is reasonableness . . . even when, judged
with the benefit of hindsight, the officers may have made some
mistakes." Id. at 761.

     To be sure, "[t]here has not been much discussion in the
caselaw of what conduct is considered 'immediately connected' to
the use of deadly force." Arnold v. Olathe, Kansas, City of,
2:18-CV-02703-HLT, 2021 WL 3129408, at *10 (D. Kan. July 23,
2021).  That court analyzed Tenth Circuit precedent, observing
that conduct within minutes of the incident might qualify as the
totality of the circumstances.  Id.  However, "the Tenth Circuit
has declined to consider 'events that occurred approximately one
hour prior to [the] actual seizure to determine if the seizure
was reasonable' because the Fourth Amendment prohibits
unreasonable seizures, and not 'unreasonable or ill-advised
conduct in general.'" Id. (quoting Bella v. Chamberlain, 24

[40]

F.3d 1251, 1256 (10th Cir. 1994)).  Indeed, Tenth Circuit precedent does not "suggest that a court can or must evaluate every decision or move made by officers from the moment they arrived on scene simply because it may have a causal connection to the ultimate use of deadly force."  Id. at *11.  "To reconsider every action or decision taken by the officers in this case over the course of a three-hour standoff would run counter to the objective standard used in evaluating excessive-force claims, as well as the caution that courts should not view police encounters with the benefit of 20/20 hindsight."  Id. at *12.

The evidence taken in the light most favorable to the Estate reveals that the Deputies failed to apprehend Barre and left him in an aggravated state on June 7, 2017, two days before the incident leading to Barre's death.  The Court reviews the conduct of the officers, however, on the day of the incident, and declines to look back any further than that date -- June 9, 2017 -- on this record.  See Estate of Taylor, 16 F.4th at 765 ("[T]he totality of the circumstances includes application of the Graham and Estate of Larsen factors to the **full encounter, from its inception through the moment the officers employed force**." (emphasis added)).

In that light, the Graham and Estate of Larsen factors favor the Deputies.  Even if the first and third Graham factors

(severity of crime and evasion of arrest) might favor the
Estate, the second -- and most important -- factor favors the
Deputies.  That is, there appears no genuine dispute as to
whether Barre posed an immediate threat to the safety of
officers or others.[4]

---

[4] The Estate submits that Barre was a "possible but unknown
threat" without citation to the record, and that in any event if
Barre was threat that situation was caused by the Deputies
conduct.  Opp'n Deputies' Mot. 24.  The Video, while not
capturing the actual shooting supports the other unrefuted
evidence in the record with respect to immediate danger posed by
Barre.  For example, the Tulsa County Sheriff's Office report on
the incident, submitted by Barre's Mother, recites that "Video
evidence, which is attached to the TRACIS package, supports the
fact that there were citizens inside the [Super Stop] as Barre
was entering."  Opp'n Deputies' Mot., Ex. 12, July 14, 2017
Corporal Marshall Eldridge Report 8, ECF No. 61-12.  Further,
the Estate's argument that the Deputies could have forced a
confrontation earlier is an assertion of bad tactics, not a
constitutional violation under the Fourth Amendment.  See
Sheehan, 575 U.S. at 615 ("[Plaintiff] cannot establish a Fourth
Amendment violation based merely on bad tactics that result in a
deadly confrontation that could have been avoided." (internal
quotation marks omitted)).  To be sure, Deputies Walker and
Ramsey made no attempt to confront Barre (who they knew to be
armed and in a psychotic state) when he briefly paused, disarmed
himself and placed his palms to the sky, and then rearmed
himself and continued southbound on MLK Boulevard.  At
deposition, the Deputies stated there was too much distance and
not enough time when Barre stopped and briefly disarmed, and did
not want to cause a confrontation with a known hostile
individual without backup as the reason for non-confrontation.
Walker Depo. 168:17-169:5; Opp'n Deputies' Mot., Ex. 3, Ramsey
Dep. 152:11-154:25, ECF No. 61-3.  A review of the record on
this issue reveals there is no other evidence for a jury to
reject the Deputies' account.  Cf. Huff v. Reeves, 996 F.3d
1082, 1089 (10th Cir. 2021) ("Although circumstantial, the
evidence described . . . is more than sufficient to permit a
factfinder to reject Reeves's account.") (citing Pauly v. White,
874 F.3d 1197, 1218 (10th Cir. 2017) ("[T]he court may not
simply accept what may be a self-serving account by the police

The Larsen factors also appear mixed, but favor a determination of objective reasonableness: (1) the Deputies and others ordered Barre to drop the weapons and not enter the Super Stop, (2) Barre had made numerous threatening gestures with the knives towards the Deputies and was brandishing them as he walked, (3) the distance is unknown at the time of the shooting but from the video it can be inferred it was mere feet, and (4) Barre was intent on brandishing weapons and entering a store in a psychotic and agitated state.[5]

Viewing the facts (including the Video), in their totality, the Graham and Larsen factors favor a determination that it was objectively reasonable for the Deputies to have taken the actions of following, warning, tasing and then shooting Barre, who ultimately posed an immediate threat to the safety of the

---

officer.  Rather, it must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably.") (internal quotation marks omitted)).

[5] The Estate correctly argues that the mental health of Barre must be taken into the calculus.  Opp'n Deputies' Mot. 20 (citing Estate of Ceballos v. Husk, 919 F. 3d 1204 (10th Cir. 2019); Allen v. Muskogee, Okl., 119 F.3d 837 (10th Cir. 1997); Sevier v. City of Lawrence, Kan., 60 F.3d 695 (10th Cir. 1995)). Nevertheless, while "[t]he mentally ill or disturbed condition of the suspect is a relevant factor in determining reasonableness of an officer's responses to a situation," the Tenth Circuit also holds that, at the same time, "officers are not required to use alternative, less intrusive means if their conduct is objectively reasonable." Estate of Ceballos, 919 F.3d at 1214.

officers and others when Barre attempted to enter a convenience store with two large knives.[6]  Accordingly, the Estate's Fourth Amendment claim against Deputies Ramsey and Walker (and by extension Deputy Holloways in alerting them to Barre) fails on the merits.[7]

### 2. Count II -- Failure to Intervene -- Fails as Matter of Law

To the extent the Deputies are entitled to summary judgment on count I, count II for failure to intervene fails as well. As a district court within the Tenth Circuit recently observed:

> The Tenth Circuit has noted that, "'for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation[.]'" Jones v. Norton, 809 F.3d 564, 576 (10th Cir. 2015) (quoting Harper v. Albert, 400 F.3d 1052, 1064 (7th Cir. 2005)).  In considering the issue, the Tenth Circuit indicated that it was "unaware of any failure to intervene case in which this court has reversed either a grant of summary judgment or qualified immunity to a government actor without first finding at least a genuine issue of material fact as to an underlying constitutional violation."  Jones v. Norton, 809 F.3d at 576.

---

[6] The Estate argues that the Deputies could have forced a confrontation earlier, Opp'n Deputies' Mot. 25, but this is an assertion of bad tactics, not a constitutional violation under the Fourth Amendment.  See Sheehan, 575 U.S. at 615.  Reviewing the Deputies' tactical decision to avoid confronting Barre in an armed state earlier is just the type of "20/20 hindsight" that the Court is required to avoid.  Id.

[7] It is undisputed that Deputy Holloway was not on the scene at the time of the shooting incident.  Deputies' Mot. ¶ 16, at 8.  Rather, she merely relayed Barre's location to Deputies Ramsey and Walker.  Id.

Stevenson v. City of Albuquerque, 446 F. Supp. 3d 806, 871
(D.N.M. 2020).  For the reasons set forth, supra, there is no
constitutional violation under either the Fourteenth or Fourth
Amendments to the Constitution, and therefore failure to
intervene claims also fail.

### 3. The Deputies are Entitled to Qualified Immunity.

The Deputies are entitled to qualified immunity because the
first prong of the qualified immunity test is not satisfied
where the Court rules that there was no underlying
constitutional violation by the Deputies under either the Fourth
or Fourteenth Amendments to the United States Constitution.
Estate of Taylor, 16 F.4th at 757.  The Court need not, and does
not, reach the clearly established prong of qualified immunity
analysis.

### 4. Count III and Count IV are Not Brought Against the Deputies.

Neither count III for failure to train or supervise, nor
count IV under the Oklahoma Constitution applies to the
Deputies.  See Am. Compl. ¶¶ 53-57, 58-75.

### C.   The Sheriff's Motion for Summary Judgment (ECF No. 52)

The Sheriff's motion for summary judgment is meritorious
inasmuch as there a basis neither for an official capacity
municipal liability claim, count III, nor for an Oklahoma state
constitutional violation, count IV.  The claim against the

[45]

Sheriff is solely brought in his official capacity.  Am. Compl.
¶ 6.

### 1. Count III Against the Sheriff Fails as Matter of Law.

The Estate's section 1983 claims against the Sheriff appear
to be "(1) a failure to train the Mental Health Unit in how to
properly assist citizens under Court-order with severe or
complex mental health conditions; and (2) failure to supervise
the Mental Health Unit in responding to citizens under Court-
order with severe or complex mental health conditions."  Am.
Compl. ¶ 55.  "A claim against a state actor in his official
capacity -- such as Sheriff [Vic Regalado] -- 'is essentially
another way of pleading an action against the county or
municipality' he represents, and is considered under the
standard applicable to § 1983 claims against municipalities or
counties."  Dodson v. Reed, 18-CV-221-TCK-CDL, 2021 WL 4168357,
at *9 (N.D. Okla. Sept. 13, 2021).  "To establish municipal
liability under § 1983, 'a plaintiff must show 1) the existence
of a municipal policy or custom, and 2) that there is a direct
causal link between the policy or custom and the injury
alleged.'"  Meadows v. City of Oklahoma City, 851 F. App'x 127,
130 (10th Cir. 2021) (unpublished) (quoting Hinton v. City of
Elwood, Kan., 997 F.2d 774, 782 (10th Cir. 1993)).

As an initial matter -- and dispositive here -- the general rule under Tenth Circuit precedent is that "[a] municipality may not be held liable where there was no underlying constitutional violation by any of its officers" under the first prong of the qualified immunity test.  Fenn v. City of Truth or Consequences, 983 F.3d 1143, 1150 (10th Cir. 2020), cert. denied, 142 S. Ct. 111 (2021), (quoting Hinton v. City of Elwood, Kan., 997 F.2d 774, 782 (10th Cir. 1993) (citing City of Los Angeles v. Heller, 475 U.S. 796, 799, (1986))).  Indeed, "[w]hen a finding of qualified immunity is predicated on [the first prong of qualified immunity], such a finding is equivalent to a decision on the merits of the plaintiff's claim."  Hinton, 997 F.2d at 783. (citation and quotation omitted).  "In such a case, a finding of qualified immunity may preclude the imposition of any municipal liability."  Id.

There is, however, a limited exception where the individual acts of many officers might each not be unconstitutional but their sum results in an unconstitutional violation.  Crowson v. Washington County Utah, 983 F.3d 1166, 1191 (10th Cir. 2020), cert. denied sub nom. Washington County v. Crowson, 142 S. Ct. 224 (2021) (citing Garcia v. Salt Lake County, 768 F.2d 303 (10th Cir. 1985)).  There, the Tenth Circuit recently held:

> Because municipalities act through officers, ordinarily there will be a municipal violation only where an individual officer commits a constitutional

[47]

> violation.  But, as in <u>Garcia</u>, sometimes the municipal
> policy devolves responsibility across multiple
> officers.  In those situations, the policies may be
> unconstitutional precisely because they fail to ensure
> that any single officer is positioned to prevent the
> constitutional violation.  Where the sum of multiple
> officers' actions taken pursuant to municipal policy
> results in a constitutional violation, the
> municipality may be directly liable.  That is, the
> municipality may not escape liability by acting
> through twenty hands rather than two.
>
> The general rule in <u>Trigalet</u> [v. <u>City of Tulsa,
> Oklahoma</u>, 239 F.3d 1150 (10th Cir. 2001)] is that
> there must be a constitutional violation, not just an
> unconstitutional policy, for a municipality to be held
> liable.  **In most cases, this makes the question of
> whether a municipality is liable dependent on whether
> a specific municipal officer violated an individual's
> constitutional rights.  But <u>Garcia</u> remains as a
> limited exception where the alleged violation occurred
> as a result of multiple officials' actions or
> inactions.**

<u>Id.</u>  Notably, <u>Crowson</u> and <u>Garcia</u> were claims relating to Eighth

Amendment deliberate indifference to prisoner medical care.

This exception is therefore quite distinguishable from typical

excessive force cases, as here, where municipal liability

derives from the acts of the officers.  <u>Id.</u>  Indeed, the Tenth

Circuit recently held, citing the general rule in <u>Crowson,</u> that

the lack of an underlying constitutional violation by an

officer's conduct barred a municipal liability claim:

> Ms. Murray does not dispute that her argument for
> reversal on the § 1983 claims against OKC and Chief
> Citty is dependent upon our reversing the claims
> against Officer Galyon.  <u>See</u> <u>Crowson</u> v. <u>Washington</u>
> County, 983 F.3d 1166, 1191 (10th Cir. 2020) ("In most
> cases, . . . the question of whether a municipality is
> liable [is] dependent on whether a specific municipal

officer violated an individual's constitutional rights."). Because we hold Officer Galyon did not violate Mr. Simms's rights, we affirm the district court's decision with regard to OKC and Chief Citty.

Redd v. City of Oklahoma City ex rel. City of OKC Police Dept., 20-6145, 2021 WL 3909982, at *15 (10th Cir. Sept. 1, 2021); see also A.V. through Hanson v. Douglas County Sch. Dist. RE-1, 21-CV-0704-WJM-SKC, 2022 WL 504138, at *13 n.9 (D. Colo. Feb. 18, 2022) ("While it is true that the sum of multiple officers' actions taken pursuant to municipal policy may result in a constitutional liability even if no single municipal officer violated an individual's constitutional rights . . . this situation is not applicable here as the [Officers] are alleged to have engaged in substantially similar conduct that, taken either together or separately, does not rise to the level of a constitutional violation.").

The Estate has argued in its brief that Garcia applies, Opp'n Sheriff's Mot. 16, 21-22, and at the February 28, 2022 hearing, relied on Crowson for the same proposition. Nevertheless, the Court rules that while the narrow exception under Crowson might be applicable to excessive force cases it is inapplicable in the context of this case. Indeed, the municipal liability claim is at its base predicated on the actions of the Deputies -- a claim that lies under the general rule.

Additionally, the Estate's attempt to expand this claim into a failure to train or supervise as causing the ultimate harm here essentially asserts a claim that Barre had a constitutional right to be detained earlier. The constitutional harm was Barre's death caused by the use of force on June 9, 2017, not by the policies or absence of policies with respect to what occurred in the days leading up to the incident. Even if that pre-incident conduct were relevant, as the Seventh Circuit has held, "there is no constitutional right to be deprived of liberty." Wilson v. Formigoni, 42 F.3d 1060, 1066 (7th Cir. 1994); Ferguson v. Cook County Correctional Facility/Cermak, 836 F. App'x 438, 441 (7th Cir. 2020) (unpublished), cert. denied sub nom. Ferguson, 211 L. Ed. 2d 133 (Oct. 4, 2021). Accordingly, the Estate's theory of direct liability fails because not only is there no underlying constitutional violation by any officer here, but there is no broader right to be detained or deprived of liberty that was violated by the alleged lack of training or supervision.

## 2. Count IV -- Article II, Section 7 of the Oklahoma Constitution Fails as Matter of Law.

The Sheriff narrowly argues that an Oklahoma constitutional claim for excessive force will not lie against a municipality pursuant to Okla. Const. art. 2, § 30 ("Section 30"), under Perry v. City of Norman, 341 P.3d 689, 692 (Okla. 2014), because a claim is available under the Oklahoma Governmental Tort Claims Act, 51 Okl. St. Ann. § 151 et seq. ("OGTCA").  As noted by the Sheriff, the Estate does not oppose the motion for summary judgment with respect to count IV, see generally, Opp'n Sheriff Mot.; Reply Sheriff's Mot. 8, and therefore that count appears abandoned.  See Jones v. Brennan, 16-CV-0049-CVE-FHM, 2017 WL 5586373, at *4 (N.D. Okla. Nov. 20, 2017) (citing Hinsdale v. City of Liberal, Kansas, 19 F. App'x 749, 768-70 (10th Cir. 2001) (unpublished)).

The Estate asserts in its Amended Complaint that under Article II, Section 7 of the Constitution of the State of Oklahoma, Okla. Const. art. 2, § 7 ("Section 7") -- not Section 30 as argued by the Sheriff -- Barre "had rights at least as protective as his rights under the Fourteenth Amendment to the United States Constitution."  Am. Compl. ¶ 59.  This assertion is correct as matter of law.

> Although the Oklahoma Constitution does not contain an
> equal protection provision like or similar to that found in

> its federal counterpart, . . . [the Oklahoma Supreme Court]
> has explained that a functional equivalent of the equal
> protection guarantee of the 14th Amendment of the U.S.
> Constitution is part of the State's Due Process provision,
> Okla. Const. Art. 2, § 7.

State ex rel. Bd. of Regents of Univ. of Oklahoma v. Lucas, 297
P.3d 378, 393 n.28 (Okla. 2013).  Indeed, as the Oklahoma
Supreme Court has held, the "[d]ue process protections
encompassed within . . . [Section 7] are generally coextensive
with those of its federal counterpart" under the Fourteenth
Amendment.  Oklahoma Coal. for Reprod. Justice v. Cline, 441
P.3d 1145, 1153 (Okla. 2019).

Nevertheless, as an initial matter, Chief Judge Dowdell
observed, in dismissing the Board from this action in response
to an unopposed motion to dismiss, that a Section 7 claim for
respondeat superior has never been recognized by the Supreme
Court of Oklahoma.  See October 15, 2019 Order, ECF No. 32.  The
Court agrees with Judge Dowdell that the Oklahoma Supreme
Court's rulings reflect a trend to not recognize such a claim.
See id. (citing Barrios v. Haskell Cty. Pub. Facilities Auth.,
432 P.3d 233, 241 (Okla. 2018); see also Burke v. Regalado, 18-
CV-231-GKF-FHM, 2019 WL 1371144, at *3 (N.D. Okla. Mar. 26,
2019) (Frizzell, J.) (dismissing claim where no private right of
action under Section 7 available).  In fact, in 2020, the
Oklahoma Court of Civil Appeals ruled that it makes no
difference whether the claim is brought under Section 30 or

Section 7, because "the reasoning in <u>Barrios</u>, which is a straightforward application of the legislature's enacted definition of 'tort' applies equally to **any** constitutional tort, not just those at issue in that case." <u>Rowell</u> v. <u>Bd. of Cty. Commissioners of Muskogee Cty.</u>, 485 P.3d 879, 883 (Okla. Civ. App. 2021) (emphasis in original).  Accordingly, count IV brought as a free-standing claim under Section 7 of the Constitution fails as either abandoned, or alternatively on the merits as matter of law because that claim ought to have been brought if at all under the OGTCA.  The OGTCA claim was dropped when the Amended Complaint was filed and is not before this Court.  <u>Compare</u> Compl. ¶¶ 58-62, ECF No. 2, <u>with</u> Am. Compl. ¶¶ 58-75.[8]

---

[8] The Court observes, but does not rule, that the OGTCA claim premised under Section 7 due process, as opposed to an excessive force claim, appears barred by the OGTCA in any event. Exceptions to the waiver of sovereign immunity include the "[e]xecution or enforcement of the lawful orders of any court" and "the failure to provide, or the method of providing, police, law enforcement or fire protection."  O.S. tit. 51, § 155 (3), (6).  In count IV, the Estate bases its theory of liability squarely within these exceptions of waiver of sovereign immunity under Oklahoma law.  The Estate alleges broadly that when Judge Pace issued a court order that Barre be taken into custody the Deputies had a duty to "protect" Barre ostensibly by executing the order or providing police protection to him.  Am. Compl. ¶¶ 62-63.  Accordingly, the failure to execute the order or protect Barre from himself or others is likely barred.  <u>See</u> <u>Samuel</u> v. <u>City of Broken Arrow, Okla.</u>, 506 F. App'x 751, 756 (10th Cir. 2012) (affirming summary judgment in favor of municipality on respondeat superior theory where police shot and killed domestic violence suspect in attempt to protect against suspect or others under exception § 155(6)); <u>Pigeon</u> v. <u>Sweeney</u>, CIV-18-728-J, 2020

## IV. CONCLUSION

While a tragic incident, on this record, taking all reasonable inferences in the light most favorable to the Estate, the Defendants did not violate Barre's Fourteenth and Fourth Amendment rights under the United States Constitution, nor is there any liability under the Oklahoma Constitution against the Sheriff in his official capacity.  Accordingly, for the aforementioned reasons, the Deputies' motion for summary judgment (ECF Nos. 51) is **ALLOWED** and the Sheriff's Motion for Summary Judgment (ECF No. 52) is **ALLOWED**.  Judgment shall enter in favor of the Defendants.

**SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[9]

---

WL 8674674, at *2 (W.D. Okla. Dec. 8, 2020) (Jones, J.), appeal dismissed sub nom. Pigeon v. City of Oklahoma City, 21-6022, 2021 WL 3745076 (10th Cir. Aug. 5, 2021) ("Under § 155(6), a political subdivision is not liable for the negligent acts of its employees that occur when taking individuals into protective custody."); Claro as next friend Schaapveld v. City of Sulphur, CV-16-428-SPS, 2019 WL 6843666, at *4 (E.D. Okla. Dec. 16, 2019) (summary judgment in favor of municipality where officers shot and injured mentally ill person who had barricaded self in store under § 155(6)).

[9] This is how my predecessor, Peleg Sprague (D. Mass 1841-1865), would sign official documents. Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 44 years.